WILLIAM WARD JONES, Appellant, *v.* ELIZABETH G. O'CONNOR, ANITA U. GALLAGHER, MARY P. JONES, LORETTA A. JONES and CHRISTINE JONES, Respondents.

First Department, June 21, 1940.

*Joseph H. Kohan* of counsel [*Louis Kohan* with him on the brief; *Petersen, Steiner & Kohan*, attorneys], for the appellant.

*Paul G. Reilly* of counsel [*Earle, Rust & Reilly*, attorneys], for the respondents.

GLENNON, J.   Plaintiff is the brother of the defendants.   Annie C. Jones, their mother, died on August 26, 1919, leaving a last will and testament wherein she devised all of her real property in equal shares to the parties to this litigation.   Plaintiff and the defendants Mary P. Jones and Loretta A. Jones were named executors.   At the time of her death, Annie C. Jones owned five pieces of property in the borough of Manhattan, city of New York, five unimproved lots at Long Beach, county of Nassau, and two unimproved leaseholds at the Catholic Summer School located at Cliff Haven in the county of Clinton, State of New York.   Subsequent to the death of the mother, the funds in the estate were used to purchase an additional parcel of real estate also located in the borough of Manhattan.   Plaintiff was the youngest member of the family.

In or about the month of October, 1921, plaintiff had numerous conversations with his sisters concerning the possibility of liquidating the real property.   He said that he believed that his share was worth $50,000.   He quoted his sister Loretta, who seems to have been the chief spokesman for the defendants, as saying: "We will let you have thirty-eight thousand dollars and when the various properties are liquidated and we are reimbursed for the thirty-eight thousand dollars that we have advanced to you and when we all receive a like sum of thirty-eight thousand dollars, any money that comes in in excess of that we will divide equally in six parts and you will get the excess of that thirty-eight thousand dollars."

After thinking the matter over, plaintiff told Loretta that the proposition would be acceptable to him and he quoted her as saying: " All right, I will go down to Mr. Earle, our attorney and have him draw up a contract."   Plaintiff denied that he accompanied his sister to Mr. Earle's office.   She, on the other hand, asserted that he went there with her.   Incidentally, it might be remarked that Mr. Earle was not called as a witness in this case.

The agreement which was entered into between the parties bears date as of March 11, 1922.   However, it was not signed until about the month of February, 1926.   A reading of the testimony indicates quite conclusively that Loretta was the dominating spirit in the preparation of the terms and conditions.   She said: " When I stipulated those different things I spoke about he [plaintiff] never said anything."   She testified: " He said ' Let every-

thing go,' as I said." While there is a dispute between plaintiff and Loretta as to the time the discussions took place, for the purpose of this case it is not important.

The contract provided, in effect, that the property in the month of March, 1922, was valued at $228,000. The price which plaintiff was to receive for his share of the estate, at that time, was fixed at $38,000. In addition thereto, the parties agreed as follows:

"*Fourth.* If during the lifetime of the party of the second part hereto, the properties above described be sold at prices which net to the parties of the first part more than the above mentioned Two hundred Twenty-eight thousand ($228,000) Dollars in the aggregate, the said party of the second part shall be paid by each of the parties of the first part, then living, one-sixth of the amount by which her undivided one-fifth of said net sale price exceeds the above described sum of Forty-five thousand six hundred ($45,600) Dollars.

"*Fifth.* This agreement shall not inure to the benefit of anybody but the said William Ward Jones, individually, shall not be assignable by him, nor available to his creditors, if any, nor to his legal representatives, and this agreement shall terminate upon his death.

"*Sixth.* This agreement shall be binding on each of the parties of the first part hereto only as to her undivided one-fifth interest in the part of the net sale price which exceeds said aggregate sum of Two hundred Twenty-eight thousand ($228,000) Dollars and the obligation of each of the parties of the first part to pay, with respect to her one-fifth interest, shall terminate upon the death of such party of the first part hereto."

Concededly, the defendants sold all the parcels in the borough of Manhattan at prices greatly in excess of the basic figure of $228,000. They have failed to account to their brother for the share to which he was entitled under the terms of the contract.

Neither the lots at Long Beach, which at the time of the trial had comparatively little value and were incumbered by past due taxes, nor the leaseholds at the Summer School, which were estimated to have a value of approximately $500, were sold or disposed of at the time this action was instituted. However, plaintiff has waived any interest in those properties in order that he might proceed to compel the defendants to account to him for the large profits which each of them has made as the result of the sales and certain condemnation proceedings pertaining to the Manhattan properties.

A sale involving properties located on East Thirty-sixth street took place in 1929. Plaintiff spoke to his sister Loretta concerning

his share of the profits, which he estimated to be in excess of $90,000. As part of the price, defendants had taken back a purchase-money mortgage. His sister told him, in effect, that if the defendants were to give him that amount of money, it would exhaust practically all the cash received in the transaction. Loretta informed him that when the mortgages were paid, he would receive his share in full. He replied, " If I have to wait, I have to wait." Later it became necessary for the defendants to foreclose their purchase-money mortgage and take back the property. The title was reacquired by the defendants in May, 1931, and they continued in possession until December 30, 1938, when these parcels were condemned by the city of New York.

One of the parcels of property located at 164 East Sixty-fifth street, borough of Manhattan, was sold on April 25, 1924, for $51,500. After deducting expenses, the net amount received by the defendants was $50,303.50. The property at 161 East Fifty-sixth street in the same borough was sold on May sixteenth of the same year for $30,000. After deducting the amount due on the mortgage, brokerage and attorney's fees, the defendants received $18,181. The property to which reference has already been made on East Thirty-sixth street was sold on January 3, 1929, for $764,666.66. After deducting the amount due on the mortgage, defendants received $719,180.66, which was made up of a purchase-money mortgage in the sum of $509,777.78 and $209,402.88 in cash. It will be recalled that it became necessary to foreclose this purchase-money mortgage, as the result of which the defendants again became the owners. Property belonging to the estate at 643 First avenue was condemned by the city of New York on May 10, 1938. After deducting expenses and fees, the defendants received $30,037.07 from the city. The property located at 670 Second avenue was condemned by the city of New York on December 30, 1938. The amount which the defendants were awarded as a result of this condemnation proceeding was not shown at the time of the trial. Apparently the final figures were not available for use at that time. After defendants reacquired title to the properties on East Thirty-sixth street, the premises were condemned by the city of New York on January 13, 1939. The final awards were not fixed at the time of the trial. The total cash received by the defendants prior to the commencement of this suit was $338,511.11. How much has been or will be received as a result of the last two condemnation proceedings we do not know.

At Special Term the complaint was dismissed on the merits. The court apparently based its decision upon the theory that the contract between the parties bearing date March 11, 1922, in so far

as it provided for additional payments to plaintiff, was without consideration. Furthermore, the court determined that the six-year Statute of Limitations, which incidentally was pleaded only as a partial defense, was a bar to recovery by plaintiff, and in addition thereto that this action was prematurely brought.

We do not believe that the six-year Statute of Limitations has any application to this case. The sales which took place in 1924 did not net enough money to give plaintiff a right of recovery at that time. The 1929 transaction was made up, to a great extent, of the purchase-money mortgage which, as we have seen, was foreclosed. Defendants not only again came into possession of that real estate but held it until 1939 when it was condemned.

Paragraph " Fourth " of the contract, which heretofore has been quoted at length, provided that if during the lifetime of plaintiff the properties described " be sold at prices which net " to the defendants more than " the above mentioned Two hundred Twenty-eight thousand ($228,000) Dollars in the aggregate," the plaintiff shall be paid by each of the defendants then living " one-sixth of the amount by which her undivided one-fifth of said net sale price exceeds the above described sum of Forty-five thousand six hundred ($45,600) dollars." All the defendants it might be remarked were living at the time this case came on for trial.

It seems to me that it would be idle to urge that this claim is barred by the six-year Statute of Limitations and in addition thereto it was a contradiction, to say the least, to hold that the action was prematurely brought. It should be noted that para-graph " Fourth " does not provide that all the properties had to be sold before plaintiff would be entitled to an accounting. We do not believe it proper to say that plaintiff should be deprived of the benefits of his contract by the refusal of the defendants to dispose of the Long Beach lots and the leaseholds at Cliff Haven which, considering the amount of money involved, are practically worth-less. Perhaps it would be apropos to quote part of the opinion of Judge WERNER in *Simon* v. *Etgen* (213 N. Y. 589): " The construc-tion which counsel for the appellants asks us to place upon this agreement is that it obligated neither Burgess nor his executors to sell until they felt disposed to do so. We may admit that this would be the extent of the obligation imposed by the naked letter of the contract, but equity looks through the form to the substance and purpose of the agreement, and moulds its decree in accordance with what the parties may fairly be presumed to have intended. Every contract implies good faith and fair dealing between the parties to it. [Citing cases.] When the contract between these parties is read in the light of this implication, it is obvious that the

defendants assumed the obligation to sell within such reasonable time as the circumstances would permit. Any other construction of the contract would permit Burgess and his successors in interest to enjoy the fruits of Mela's release without making any effort to sell the property, and thus Mela would be left to live, perhaps to a ripe old age, without reaping the slightest advantage from his own prompt performance of the contract. The courts always avoid, if possible, any construction of a contract that is unreasonable or inequitable, and especially one that will place one of the parties at the mercy of the other. [Citing cases.] It is to be observed, moreover, that the language of this written instrument was chosen by Burgess, and if it is to be regarded as ambiguous, or as failing to adequately express the agreement that was in the minds of the parties, Mela and his assignee are entitled to the most favorable construction thereof. [Citing cases.]"

In connection with this, it might be advisable to refer again to the fact that Loretta Jones, in referring to the attitude of her brother at her lawyer's office where the contract was drawn, said: " When I stipulated those different things I spoke about he never said anything."

The next question involved is as to whether or not the contract between these parties was supported by a consideration flowing from plaintiff. It is not disputed by the defendants that plaintiff's original asking price for his share was the sum of $50,000. Their contention seems to be that the sum of $38,000 was agreed upon finally and the additional amounts provided for in the contract were to be given to plaintiff out of the kindness of their hearts simply because he was their brother. Yet, to offset this claim, we have the testimony of Loretta Jones which sheds considerable light upon the intentions of the parties. She said: " Well, when it was practically finished I said in the office, Mr. Earle and my brother were there, I said ' I still do not feel right about signing this. We are still a little upset about signing it.' Mr. Earle wanted to know why and I told him the same story, that I had said to my brother in the beginning that we were afraid of signing any paper, of signing anything that might get us into trouble. Mr. Earle turned around to my brother who was sitting in the corner of the room and said ' Well, Will, that is up to you. What do you say? ' My brother laughed and he said ' I think we had better put it in black and white. Women forget sometimes what they say.' So then we went ahead and the agreement was finished and when he asked for it we signed it."

If, as contended by the defendants, plaintiff was willing to sell his share for $38,000, there could not be any reason for going down

to defendants' lawyer's office for the purpose of preparing the contract which contained all of the defendants' stipulations. Until the minds of the parties met, plaintiff well could have refused to deliver his deeds covering his interest in the properties.

There is no question about the fact that plaintiff acted upon the contract which was dated March 11, 1922. The record shows that on June 14, 1922, after recovering from an illness, plaintiff executed a series of deeds and an assignment of the leaseholds and a general release in favor of the defendants. All these documents were dated March 14, 1922. Of course, it is quite apparent that the purpose of the release was to cover claims which may have existed prior to the date which the instrument bore. It matters not a whit that the contract in suit was signed by the parties in 1926. Plaintiff acted upon it, thereby giving up all his rights in his mother's estate. The only right which he retained was the right to share in the profits, when the properties were sold, in excess of the amount provided for in the contract. (See *Newburger* v. *American Surety Co.*, 242 N. Y. 134; *Sanders* v. *Pollitzer Bros. Fruit Co.*, 144 id. 209.)

While we have available sales prices and other figures, it is impossible at this time to determine exactly how much money plaintiff is entitled to receive as a result of the contract in suit.

For the reasons assigned, the judgment should be reversed and an interlocutory judgment directed in favor of plaintiff.

O'MALLEY and TOWNLEY, JJ., concur; MARTIN, P. J., and DORE, J., dissent and vote to affirm.

Judgment reversed and an interlocutory judgment directed for plaintiff requiring defendants to account for all sums of money due and owing to plaintiff. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.